safety in facilities like Mar-Jac's poultry processing plant. And a key tool towards effectuating that responsibility is the inspection warrant. For many violations affecting worker safety, there's really little other way for the agency to determine whether violations are ongoing other than going in and taking a look. And in this case what happened was that in February 2016 there was a serious workplace accident that Mar-Jac was required to report to OSHA because it resulted in the inpatient hospitalization of a worker. And that prompted OSHA inspectors to go to the Mar-Jac facility. One of the things that they asked for when they were there were OSHA 300 logs. These are mandatory records of injuries and illnesses that various employers, particularly high employers in industries known to have a lot of hazards, not low hazard industries but high hazard industries, are required to keep these records. They're required to keep them for a period of five years. And here OSHA asked to see these records going back for three years. When they looked at those experience in with poultry processing plant investigations, looked at these records, they found cause for concern. And because Mar-Jac had not consented to an inspection that went anywhere beyond the particular tools and individual who had been involved in this February 3rd 2016 accident, OSHA went to court to get a provided those OSHA logs with the notations of the OSHA personnel along with declarations of OSHA personnel. And ultimately the magistrate held a hearing and testimony was given. And what that presentation showed was that in looking at these records, OSHA had found the very kinds of injuries that you would expect to see if a poultry processing plant were engaging in a number of known types of violations or failures to do a variety of things to address known hazards in this industry. Can I ask you a procedural question before you continue the rest of your argument? Has OSHA reissued the warrant as narrowed by the to just hold off on everything until this appeal is completed? Right, so they have held off until this appeal is completed with the hope that they can do one investigate inspection that addresses all of the concerns at once. It also, frankly, the posture of the case was a little bit out of the ordinary. We would normally, I think, be accustomed to seeing a court when it determines that certain areas are appropriate for a warrant to let the warrant stand with regard to those and quash it in all other respects. Here what the court did was quash the warrant in its entirety while simultaneously saying you've established reasonable suspicion, you've established a proper constitutional basis for proceeding to inspect with regard to these four hazards. But nonetheless quashed in its entirety and that left the agency... What's the difference in the scope of a warrant you sought? So here we have, again, the court said that with regard... Is there a difference first? What we are seeking now is absolutely... Can you answer that yes or no? Is there a difference between the programmed inspection and the one OSHA was seeking? In the first instance, no, there wasn't. But there is now. That's right. No, no, I'm talking about... Yes, Your Honor, yes. There was no difference... The warrant would give the scope of inspection that the program inspection would give. Is that right? That's right, but it also specified that they were seeking to inspect with regard to the bases laid out in the declarations, for example. And in the declaration, for example, of Assistant Area Director McCullough, it's more limited. It's limited... That declaration is addressing these specific hazards that we're now concerned with. So we have the four areas that the district court said the agency had established reasonable suspicion for. And now we're before this court to address five others. And these are ones where, again, the agency personnel looked at the logs and found cause for suspicion. Now, Marjack's response, the response of the district court, was in effect, well, there could be that they weren't caused by violations. Your Honors, we don't dispute that, but that's not the constitutional question. That's not the constitutional standard. The issue, as courts have said again and again, isn't whether there might be an innocent explanation. It's only whether, as a constitutional matter, the question is only whether the agency had a plausible basis for its concerns. Because we're not talking here about OSHA issuing citations, determining that violations have taken place. That's a different standard. OSHA violations have four elements. They, once issued, they can be subject to challenge, etc., etc. What we're talking about here is whether OSHA gets to take a look. I'll tell you what my concern is. Absolutely. Unbridled discretion on the part of the management. On the part of the management. Whether or not you have an accident, whether or not, and in fact, to turn it into a programmed situation, when the plan that was drawn up for the division, for whatever, District 4, had a way in which you selected a very neutral way in which you select programmed inspections, and then we shift, we take an accident, and all of a sudden, the management can go to the whole work. So, that's a total, as I see it, unbridled discretion. Or maybe you can tell me how the discretion is bridled. Once there's an accident. So let me be very clear about this point. That question is not presented in this appeal. Well, I'm asking the question anyway. Yes, yes, yes. I'm just one of these curious judges. Where would I look for the bridle in the plan under these circumstances? Well, Your Honor, I think you look to the court, and what I mean by that, because I realize in the first instance it doesn't sound like an obvious answer. In Barlow's, when there's discussion of concern about unbridled discretion, it's concerned... I'm talking about this document? Absolutely, Your Honor, and I apologize if... Sections 9 and 10? Yes. I want to know where in the document I can find constraints on the management's, management meaning whoever calls the shots, decision to turn an inspection for an accident into a program inspection. Maybe I have it totally wrong in my mind. Your Honor, the document to which you're referring is a regional emphasis program, which at the time that this search was taking place, that policy document had looked at the poultry processing industry, and based... Then there is unbridled discretion is what you're saying. No, I'm saying that that document made a determination... Where do I look for the constraints? The constraint was that that document just said we're going to, in every instance, where our resources permitted, and every time OSHA does any kind of search... Can you set me anything in this document that tells me? So that document, I don't have the page number in front of me, again, because this is not at issue in this appeal, but that document directs local area directors that whenever there is the kind of accident, serious accident that was reported here, for example, that prompts an unprogrammed inspection, they are to expand it into a programmed inspection if it's at a poultry processing plant in this region. Now, there are some questions about resources presented there, but it's true that any time OSHA seeks a warrant to undertake any kind of inspection, there's always a determination that has to be made about whether resources permit it. So there wasn't discretion in the sense that, other than the resource question, that policy simply dictated that in every instance, unprogrammed inspections would be extended. Are you telling me I can't find anything in writing that tells me what... It was... Where the constraints are. The constraint was that you were to do it in every instance, essentially. Can I quit looking for something? Sure, yes, absolutely, Your Honor. Absolutely. But let me just add one more note about this, just to go back to my original answer doesn't sound odd. The reason I referenced the courts is that in Barlow's, the concern about unbridled discretion was about people in the field making determinations and doing warrantless inspections. Here, even when OSHA would seek to do an expansion of a search, they had to go to court to get a warrant. And so here we did that. And so it was the district court that was looking at what was presented. We have not taken an appeal of the portion that, Your Honor, Judge Toflap, that you're identifying as an area of concern. The question here is much simpler and much more straightforward. Here, it's about whether or not the agency had a plausible basis for its concerns. And we think that there's no question that it did on this record, where we have serious injuries. And Marjack will make the argument that these are potentially not serious at all. But the record speaks volumes and it speaks otherwise, because in each of these areas we have individuals losing time at work or being placed on restricted work for extended periods. I see that I'm running short of time. I'm happy to go into more detail on what this record shows. Rebuttal time. Sorry? You say some rebuttal time. If there are no questions, that is what I will do. I thank you, Your Honor. Mr. Stein. Am I off base, Mr. Stein? No, there's nothing in that program. There is nothing in that program that put any constraint on the program. And in fact, Judge O'Kelley noted that the government argued that, hey, we selected everybody and the only discretion the area director had was to deselect, except for he deselected everybody but one company for that whole plan. And he had the unbridled discretion to decide whether to go even do an investigation of a hospitalization call or a complaint call, which he admitted during the transcript. And then it was his unfettered discretion to decide when did he have the resources to do one of these things. And on top of everything else, as the record reflects, they had a list that they were supposed to pick from and MARJAC wasn't even on the list. There was no bounds to his discretion at all. Let me ask you this question. Let's say that a different poultry processing plant, not MARJAC, has a number of incidents. Let's say that the incidents undoubtedly cover 12 out of the 16 noted possible hazards. At that point, can the agency say, we're going to go in for 12. We might as well use the programmatic inspection for that poultry plant because we only have four more to go. Would that be unbridled discretion in your opinion? In the sense that they left that decision to the field officer, it violates what Barlow said that you can't give the unfettered discretion to a field officer, which is what they did. So in that particular situation, I would say yes, because that's not what the program said. Now, you could have written the program and the program has a constraint in it. There's a random selection provision in the plan that says we will randomly select one and we will go out. And that type of a neutral administrative plan has been upheld by the courts over and over and over again. But they didn't use that part of the plan. They used this expansion, which runs right smack into Sarasota Concrete and that's the problem. Now, Sarasota Concrete does say, if I have enough there, that I may go and do the whole facility. And that is true, that's what this court has said in Sarasota Concrete, but that's not the facts in this case. I'll say what they tried to do here. One of the fundamental problems with what they're trying to do is they're trying to take specific evidence, and this goes straight to Sarasota Concrete, and say we got specific evidence of, let's just use the example, six sprains and strains in 2015. And therefore, we want to investigate the entire facility for all slip, trips, and fall hazards. Now, when you go look at those six events in this OSHA log, the log does not require us to put down cops. It doesn't. It says what happened. So, one of those six examples was somebody sprained their right hand. That's what it says on the log. Another one says I bruised my right foot. That's all there is. There were 1,100 employees in MARJAC, and the period of time they looked at covered over 2 million hours. So to have six sprains of wrist and ankles and knees, what does that show us? It doesn't show us anything at all that's going in that gives us a reasonable suspicion of a possible violation. So your point, as I understand the brief, maybe not the heading in the brief, but the and not, in the appropriate case, provide the requisite reasonable suspicion for something, but that in this case, they do not. Well, in this case, let me give you an example that's in the transcript. Because if you had 1,100 employees and you had 1,000 sprained ankles in the course of two months, you might say there's a problem somewhere. And I would think the court below would have looked at those facts and exercised their discretion. Judge O'Kelley got it right. He properly said, here's the standard. The question before this court is not whether Judge O'Kelley made a legal error. You read the decision, the standard and the words he uses repeatedly is reasonable suspicion of a violation. Well, the question before us is whether or not the district court abused its discretion. Correct. It can be abused its discretion in one of two ways. The first is it misapplies the law, which is why I was looking for standards. Yes. Because this is not a... I know about the program. There are standards about that. It's all at random. It's a lottery. There's nothing in the writing that has a thing to do with a programmed inspection triggered by an accident, however large or small. There's nothing in that program whatsoever. I'm looking for a rule of law which says, in effect, you have a random situation one way, but management can decide to do a programmed out of an accident. No bridle. The point I'm making is I'm looking for that rule. Right. There's no... The other way to abuse discretion is to make an erroneous finding of fact, and there are no erroneous fact findings with regard to the accident. No, Your Honor. They're not. So the question becomes whether or not, as I see it, and I may be dead wrong, whether or not the mere accident can trigger a programmed inspection, which may be far beyond finding the solution to the accident. Am I off base? As counsel pointed out, they have not appealed that particular issue, but you're not off base. There was nothing there. The testimony at the hearing, the area director admitted he had basically unfettered discretion under cross-examination. He admitted it. Frankly, I ended the cross-examination when he admitted it. There's nothing there. The question on the OSHA 300s is not that the OSHA 300 can provide reasonable suspicion of a violation, but what they're trying to do is use these OSHA 300s and little bits of here to do an entire facility on a very broad-based issue. So for example, we had an eye injury, said blood in the eye, and it was a serious injury. It was 140 days. We're not saying that OSHA couldn't come in and said, on that one, we want to investigate that discrete event, because you could argue they had reasonable suspicion of a violation for that event. What they're trying to say is, well, you had that event, and in 2015, you had another eye injury, which reflected, it said, irritation, water. Those are the two eye injuries in 2015 out of 1,115. And what they said, based upon those two violations, one looks like a trauma, and the other one says water. They want to do a full-blown investigation of the entire facility for chemical and biological hazards. It seems to me the logical solution of this kind of a problem is, they have a restricted search, which is what the court gave. They go in and do the search, and they need to go further. They're back in court with a predicate for an expansion of the warrant. Correct. But on reasonable suspicion of specific violations? Yes. I mean, there's a showing that we need to go here. Right. The Barlow's made it very clear, and so did this Court in Sarasota Concrete, that there's only two ways that you can give probable cause on an OSHA warrant. One's a neutral administrative plan. They've not appealed that. We no longer have a neutral administrative plan before this. We're only looking at what this Court says is a probable cause, a reasonable suspicion of a violation, which is specific evidence. Typically what's happened, for example, in Sarasota Concrete, they had a complaint. They went in and investigated that particular issue, but OSHA asked, I want to do the entire plan. This Court says, no. You've got reasonable suspicion of a specific violation. We will give you cause and give you a warrant to go do that event. That's not what they're asking here. What they're asking is, hey, we've gone through the plan. We counted. And that's, their analysis, frankly, was they went through the logs and counted things. They made assumptions, but they counted things. We don't say in that, and it's an explanation. We're saying there's no explanation at all as to the cause of it. The OSHA logs require us to record anything, any injury that happens in there. We have to record. For example, one of the slips, trips, and falls happened in the break room, but because it happened on the work, the regulations say we do it, and the regulations very clearly say, you don't record it because it's a violation, you record it because an injury happened at work, even if there's minimal connection to it. So they have to be, the court has to, to assure there's not unbridled discretion, has to look at each one of these violations to see if it's specific, and what they're trying to do is trying to do a pattern. The magistrate judge and Judge O'Kelley both got it right saying, what they're really trying to do is do a wall-to-wall expansion off of counting a few events in the logs. And they said, perhaps there are circumstances where they could do a showing like Judge Jordan said if I had 1,000 sprains in 1,100 people, that would be something I think this court would say, and I would say, you're going to do an investigation of the entire plant. That's not the facts here. And if you look at the specific events for the items in which they're trying to do wall-to-walls, they all become very small. Like the eye injuries, two in 2015, they want to do chemical and biological. If you go back to 25 months, they had two cases of pink eye. That's all it says, conjective itis. But they want to do a wall-to-wall based upon those types of things, and there's no indication at all that there was a violation. And they conflate the hazards with violations, the government does. Judge O'Kelley and the magistrate judge pointed that out, that they were confusing a hazard with a violation. An example we use in the poultry processing plant, kill plants, there's wet floors. Well, wet floors can be slippery, but that's a hazard. What you have to do is abate it. You need to be doing either mats or slip-resistant boots, which, by the way, is what we did, but it's not in the record. But that, if we didn't do that, there would be a reasonable suspicion of a violation. That's what's missing in this entire analysis. And when you look at the details and look at it the way that the courts did, they understood the standard, reasonable suspicion of a violation. They said it repeatedly. They looked at these OSHA logs. They understood that OSHA was trying to do a wall-to-wall based upon these few entries, and both the magistrate judge and Judge O'Kelley noted that there was insufficient probable cost to justify a full-scope inspection. That's what they said. Not that they can't do an inspection on an individual event, but that's not what they've asked for. That's not what they're doing. Your Honor, if there are no further questions, I believe I have raised the points I would like to raise. I think we understand your position. Thank you. Your Honors, let me start by being clear about what the district court allowed, because Judge Trofatt, you suggested that it allowed a restricted search. That search was restricted to four specific areas. What we're looking for now is still a restricted search, not a wall-to-wall. We're asking for this to go back to the district court because we think there are another five areas. I thought you said there was no difference in the scope of what you want in a programmed inspection. That was only true when this case first started. That is not true now. This appeal is not asking for a programmed inspection. This appeal is not asking for a wall-to-wall. Yes, that is not presented in this appeal. This appeal is only about getting back to the district court to have a warrant issued that's both with regard to the four hazards that the court acknowledged we had reasonable cause for. You do have a warrant now. Five others. We don't at the moment. The court quashed the warrant in its entirety. Well, I understand. And said that we could proceed with regard to four. Well, the court said what you could have. Right. That's effectively saying to the magistrate, issue the warrant for that. And we are saying that. What would stop you from coming back after you found some more information and getting an extension of the warrant? Well, this appeal, the hope is that. You think that's unreasonable? I think that that requires resources and additional time and OSHA has brought this appeal because the record here with regard to five. You're in the you're in the worksite and you have some information that tells you that you need to go further. All you have to do is walk into the magistrates, drop an affidavit and proceed. That's right, Your Honor. And when we go back to that magistrate, we want this court to acknowledge. What's the argument against that? There's nothing wrong with that. What we would add to that is only this, that when this court sends it back, what we're looking for is for the court to acknowledge that contrary to the statements of the district court and Tamar Jack, it is not inimical to OSHA's mission or as they call it, that's at page 15 of their brief. And it is not a disservice to the true purpose of the logs, as they suggest, I think at page 13 of their brief. For OSHA to study these mandatory records of injuries and illnesses and to identify causes for concern that are reasonable. So to take examples that they've provided. But you're still, although you're not looking for a programmatic wall-to-wall search anymore, as I read the brief, you're still proceeding on all 16 of the hazard categories. No, that's not correct, Your Honor. We're only proceeding with regard, this appeal is addressing five hazard categories combined with the four that the court has already said we could have, that would produce a warrant that addresses nine hazard areas, not 16. Which ones are you dropping? So the only ones at issue in this appeal are biological and chemical hazards, slip, trip and fall, ergonomic injuries, and struck by hazards. And those are the ones that are addressed in the testimony and in Assistant Area Director McCullough's declaration. And these are the ones for which there was evidence of injuries that corresponded to the kinds of violations that OSHA sees regularly in poultry processing plants and therefore has cause for concern. Let me just take an example that opposing counsel offered, wet floors. There's no question that you're going to see wet floors in a poultry processing plant. There's water being sprayed everywhere, other chemicals being sprayed everywhere. Their position is, well, when you see that someone's fallen, all you know is that they fell, maybe you know it was a wet floor, but you certainly don't know that that was a violation. Well, the problem is that if you're seeing people repeatedly falling on concrete floors in a poultry plant where they have a mandatory responsibility under OSHA's regulations and under their general duty to address that hazard, to make sure that people are wearing the right footwear, that spills are cleaned up quickly, that drainage is happening, that people are trained in how to move around the plant safely. There's all these requirements that we can't know whether they're being violated and if the fall was caused by those violations until we go in and take a look. Well, let's use that example. How many incidents based on the 300 logs were you talking about in 2015? So for each of these, there's different numbers. For 20, the slip strip and fall, there was actually in 2016, even though we were only one month in, there was already one injury, a knee sprain in the offal to a sanitation worker. Now, the offal is a part of the plant that's where they do rendering. It's known to be greasy and wet. So for OSHA to look at this and see somebody was placed on five days with restricted work, a transfer because of a knee sprain, and it was a sanitation worker in a wet and greasy area, again, there could be innocent explanations. But this could also reflect the failure to adequately... Sorry, yes, Your Honor. I know, but to someone looking at it from the outside, context matters. Absolutely. If you had... Let's say you had... I'll give you the opposite of what I asked, Mr. Steins. If you have a plant that has 10,000 employees with 8 million workable hours a year, and you have one of those slip and fall incidents in the course of a year, is that enough to get a warrant? So that's not the case here. I know it's not. Let me say that there are instances... It's a hypothetical, but I'm asking you the question because human behavior is not perfect. Absolutely, Your Honor. And mistakes are going to happen even if everyone takes all the precautions that are possible. People are not perfect actors. So in my hypothetical, understanding that it is very far divorced from the facts of this case, if you had that incident report saying that someone fell in the awful rendering section of a plant, would you have a basis to seek a warrant for slip and trip in that place? I think that context matters. So if you have someone who's seriously hurt in an area of the plant that's known for being wet and greasy, and they did something that you expect to see happen if a plant isn't adequately addressing wet and greasy conditions, which they're required to address, then that very well may be cause to go in and take a look. Now here, we have a lot more than that one. We have seven injuries in 2015. So the answer is yes? The answer is it depends. So for example, the injury that prompted the site inspection here at the very beginning, there was this very serious arc flash accident where a worker had first, second, and third degree burns. Under Marjack's theory, that's only one accident. There's no cause to go in and inspect. Why is it that we have probable cause to go in and take a look when you have somebody with first, second, and third degree burns in an inpatient hospitalization? Remember that this is a constitutional challenge. The question across the board is, what does the Fourth Amendment require? Absolutely, you've run almost three minutes past your time. I apologize. I just want to make sure. Sum it up in a word or two. I just want to make sure I'm answering. We understand your position. Okay. You've made it very clear. I appreciate that. So I think with regard to each of these, I could, if time permitted it, go through the very many musculoskeletal injuries, and there in particular, the logs essentially admit that these are ergonomic injuries because they make references to lifting and moving tubs and repetitive injury. But throughout, I mean, our point really is that there may be other accidents. We understand your point, counsel. Then I ask this Court to reverse the district court. And to get us back in front of the magistrate so we can get a warrant with regard to nine hazard areas. Thank you. The next case is United States v. Jim.